[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
By Complaint dated March 27, 1997 the plaintiff wife, Shelley M. Teed-Wargo commenced this action, seeking a dissolution of the marriage on the ground of irretrievable breakdown, alimony, property distribution and other relief. The defendant husband Kenneth J. Wargo, appeared through counsel. Both parties appeared at trial with counsel on April 8-9, 1999 and presented oral testimony and exhibits. The Court after hearing and reviewing the evidence finds the following facts.
The wife whose maiden name was Shelley M. Teed, married the husband on August 3, 1980 at Portland, Connecticut. She has resided continuously in this state more then one year before the date of the filing of her complaint. All statutory stays have CT Page 4102 expired and this court has jurisdiction. The parties have no minor children issue of this marriage and further no minor child has been born to the wife since the date of the marriage. The Court further finds that no state or municipal agency is contributing to the support of the parties.
The wife is 48 years old and received a bachelors degree in Music Education in 1975 from the Hart School of Music and a Masters in Social Work in 1984. The wife further has a congenital physical condition known as spinal bifida which has been a burden since birth. The wife has been treated for said condition during her entire lifetime. According to the testimony of the parties, her physical condition has deteriorated as the years have gone by. At the time of the marriage of the parties, the wife could walk with the aid of crutches and when necessary use a wheelchair. She has had twelve different surgeries during her lifetime (8 prior to marriage, 4 subsequent thereto) including surgery for a prolapsed uterus and removal of her gall bladder. She has also suffered greatly from her spinal bifida condition and the sequelae therefrom which includes muscle spasms and blood clots in her legs.
In 1998 the wife's physical condition has deteriorated and she described her health as "not good", at the time of trial. Her physical condition has progressed to the point she can't walk even with the assistance of crutches and suffers from skeleto-muscular spasms and muscle cramps, blood clots in her leg causing pain. The wife also takes eleven (11) different types of medications (narcotic and non-narcotic) for muscle spasms, high blood pressure, pain, urinary tract infections and blood thinning because of her clotting condition. The wife's medication, prescribed by her physicians and the Yale Pain Center (in 1999) are substantially more in kind than at the marriage of the parties.
The side effects of the medication presently taken by the wife are shakiness, weakness, dry mouth and throat, and as recent as a few days before the trial blurred vision even with corrective lenses resulting in her difficulty to read. The wife is required to get out of her wheelchair during the day and to elevate her feet above her heart due to her physical and medical conditions and pain from the muscle spasm and cramping. The wife further has pain on a continual basis but said pain is lessened by medication which as a side effect results in sleepiness and occasional dizziness. The wife is scheduled for an MRI of her CT Page 4103 head and neck on April 16, 1999.
The typical day for the wife, in recent past requires her to lay in bed or on the floor with her feet propped up on pillows, other than for times of eating and personal hygiene where she uses a wheelchair to move around her house. The wife also uses the telephone frequently during the day and is also computer trained and operates a computer owned by the wife and her roommate.
The husband is 49 years old and has attained a Bachelors of Arts degree in 1972 and a Juris Doctorate degree in 1980 but is not licensed to practice law. The husband, who has a micro-tear in his rotator cuff, is of good health as of the date of the trial.
This is the first marriage for both of the parties. It is interesting to note that both parties engaged in pre-marital counseling to prepare for their marriage. The parties marriage for the most part was successful through a majority of their marital union. The wife, who met the husband prior to their union while working at the State Labor Department, taught music at the elementary school level for seven years. Because of her physical condition and prognosis for further physical problems in the future, the wife resumed her college education and obtained an M.S.W. in 1984 and embarked on a new career. She was named the director of the Connecticut Coalition of People with Disabilities, a position which she held for nine months. She then became actively involved in the establishment of a new non-profit corporation in both an administrative and fund raising capacity. She was appointed director and chief executive officer of Connecticut Union of Disability Action Groups (CUDAG) and remained on the payroll until September, 1998 when she was laid off due to lack of funding and the corporation's inability to pay her salary and the salary of her future roommate, Kevin Main, who she had previously hired as a Researcher for said organization. The wife's medical and physical condition deteriorated as the years went by due to (1) auto collision in 1995, (2) her long work hours both at the office and at home and (3) complications from her spinal bifida condition, e.g., blood clots, spasms, urinary tract infections, etc. The wife was also the major fund raiser and grant seeker for CUDAG, and in 1988 due to the above problems she was unable to raise sufficient income for CUDAG to pay administrative salaries for herself as Director ($45,000.00 annually) and Kevin Main ($29,000.00 annually), her research CT Page 4104 assistant when she advised the Board of Directors of the cash shortfall. She laid herself and Kevin Main off from employment at their direction.
The husband, prior to the marriage, worked for the State of Connecticut in claims union organization and as a Victims Advocate in Bridgeport which job he left in July, 1980. He later was employed in a Hartford law firm, Hartford Public School (teacher), the State of Connecticut DOT (data base) and as cartographer from 1981 to 1984. From 1984 to 1992 he worked for the Department of Mental Retardation as a Volunteer Services Chief (classified employee) where his job duties included speaking, training of volunteers, coordination of recreational activities, advisory work, fund raising, etc. Since July 9, 1992, the husband is employed by the Department of Corrections of the State of Connecticut as the Volunteer Program Coordinator at the Maloney Correctional Institute in Cheshire where he screens applicants, supervises inmates in matters involving community services, teaches various inmates, etc. The husbands 1998 income was for W-2 purposes $56,658.18 (Defendant Exhibit H).
The parties, through testimony and exhibits, each claim that the other is the cause of the breakdown of the marriage. The wife claims the husband would not let her spend money on various items of personal property such as a new car, television, microwave oven, etc. She further claimed that in the 1990's he often took vacations alone, to various places including civil war battlefields, skiing, Arizona (over 30's Baseball league). She also stated that his anger led to verbal explosions throughout the marriage and that during holidays he became withdrawn and generally made holiday and family get togethers stressful and lacking in enjoyment. After a dispute over the request for the purchase of a new vehicle to accommodate a motorized wheelchair in 1992 (due to physical limitations and pain from 1990 auto collision), the parties went to therapy at the request of the wife which was unsuccessful. The husband also sought out a psychiatric evaluation for depression which he claims resulted in a finding that he was not clinically depressed.
The wife further claimed after incidents concerning the purchase of land to construct a house and later the husband's refusal to purchase an old Victorian house that the wife claimed was to be her "dream house", she was of the opinion that the marriage was over and that probably wanted a legal separation in April, 1996. The parties separated in August, 1996. CT Page 4105
The husband denied the wife's claim that he was the cause of the breakdown of the marriage. While he admitted that there were some times that he was away from his wife, for business and/or pleasure, he denied that his vacations, his alleged temper or personality was a cause of the breakdown of the marriage. He claims that the causes of the breakdown of the marriage were his wife's relationship with Kevin Main starting in 1996, and her continuous job duties encompassing approximately 60 hours per week with constant home calls at home during the weekend concerning her job. He further blamed her propensity to overspend was also a cause of the breakdown. He cited her spending of her share of the proceeds from the land sold (Defendant's Exhibit 6) and the amounts of debt on her financial affidavit since their separation as evidence of her spending habits. He further stated that their marital relationship was further strained by the fact that his wife did not take care of herself due to the long work hours in conjunction with her physical disability, muscle spasms, blood clots, etc. The husband further claimed that he was worn down from the wife's physical problems which overwhelmed him and made him feel alone. The husband does agree that the marriage broke down in April of 1996 when she wanted a separation and wasn't wearing her wedding ring because of her relationship with Kevin Main.
After analyzing the above positions and claims of the parties as to cause of the breakdown of the marriage, the Trial Court concludes that the marriage has broken down irretrievably for many different reasons not attributable to the fault of either party. The Court further finds that Kevin Main's relationship with the wife did not cause the breakdown of the marriage. Mr. Main did not move in to the wife's apartment until October, 1997 and their roommate relationship although it started prior to said date did not cause the breakdown of the marriage. Further claims by the wife of the husbands alleged temperament, spending habits, baseball playing (on weekends for years) and separate vacations are not found by the court as fault on the part of the husband. Furthermore, wife's alleged propensity to want to spend money, her physical condition, long work hours and progression of increased physical limitations and pain cannot and are not found to be the fault of the wife. The court therefore concludes the marriage broke down through no fault of either party.
The wife (as of the date of the trial) is collecting unemployment compensation from the State of Connecticut in the CT Page 4106 amount of $376.00 which is to run out on April 11, 1999 unless extended. She made $45,000.00 per year prior to September, 1998. (financial affidavit dated April 9, 1999). Based upon the evidence and the objective signs of physical debilitation and pain observed by the Trial Court at the trial, the Court finds that the plaintiff's prospect for employment is poor if CUDAG or a comparable non-profit company or agency does not rehire her. The wife presently wants to return to work, but cannot say when she will return due to her deteriorating physical condition, difficulties in writing and reading. The wife and Kevin Main, her roommate share rent, cable TV, phone (basic charge), electricity on a fifty-fifty basis. The wife has accumulated substantial debt since the separation of the parties and by her own admission has spent large sums of money in credit card charges, including her funds from the sale of her jointly-owned lot and loans from Mechanics Bank. The wife claims weekly expenses of $423.00 per week and payment on recurrent debts of $129.00. The wife further testified that she plans on filing bankruptcy which will discharge her from the debt on the credit cards and loans shown on her financial affidavit. The wife further has a 403B plan at American Funds Group with a market value of $44,572.00. The parties further stipulated that no value to the car accident lawsuit listed on her affidavit shall be found by the Court, with the husband making lawsuit — re: personal injury damages and/or workers compensation benefits arising therefrom.
The husband's financial affidavit dated April 8, 1999 and filed with the court shows a weekly gross income of $1,134.83 per week and a net of $739.00 per week. He lists weekly expenses at $763.57 inclusive of the $150.00 pendente lite order which has been paid in full to the date of the trial. The husband claims no recurrent liabilities and values the marital residence at 751 W. Main Street, Cheshire, Connecticut at $90,000.00 with a first and second mortgage (State of Connecticut) balance of $103,571.00 and $3,627.00, respectively. The husband further has bank accounts totaling $12,350.00 representing money in 3 CD's from the sale of the joint lot and other money in his checking account. He further lists a $38,000.00 life insurance policy provided by his employer. The husband also lists a 401K plan with present market value of $36,429.75 and a vested retirement of $930.00 per month at age 55 per his defined benefit plan with his employer the State of Connecticut.
The Court has considered all of the factors in General Statutes §§ 46b-81, 46b-82 and other pertinent statutes, the CT Page 4107 tax implications and consequences of the financial awards set forth below. The Court finds that it has jurisdiction in this matter, all statutory stays have expired and the facts set out in the complaint are proven true. Judgment shall enter dissolving the marriage of the parties on the ground of irretrievable breakdown. It is further ordered that:
1. The defendant husband shall pay to the plaintiff wife alimony in the weekly amount of $225.00 per week until the death of either party, the plaintiffs remarriage, or the retirement from employment by the defendant whichever shall first occur when said alimony shall terminate. During the term of alimony, it shall be considered a substantial change in circumstances permitting either party to move for modification of alimony if the plaintiff is (1) re-employed with annual income over $25,000.00 or (2) there is a change in the present living arrangement with her friend Kevin Main concerning the equal sharing of household expenses.
2. The plaintiff shall quitclaim within 30 days from the date of this judgement all of her right, title and interest in the marital home located at 751 A West Main Street, Cheshire, Connecticut 06410, to the defendant, who shall pay and hold the plaintiff harmless from any liability on the first mortgage at Nationwide Mortgage, the second mortgage to the State of Connecticut, taxes and all carrying charges and/or expenses including the common charge to the Condominium Association.
3. The defendant shall maintain any and all life insurance presently available at his place of employment ($38,000.00 death benefit as set out on defendant's financial affidavit dated April 8, 1995) and any additional sum provided by his employer until his obligation to pay alimony pursuant to subparagraph 1 above has terminated.
4. The defendant shall further transfer by Qualified Domestic Relations Order to the plaintiff the right to receive one-half (1/2) of his current monthly benefit as of May 1, 1999 payable upon the retirement of the defendant. The plaintiff shall be the surviving spouse for pre-retirement death benefit, if any. This transfer shall be a tax-free transfer provided however, that payments to the plaintiff pursuant to such Qualified Domestic Relations Order shall be taxable to the plaintiff as provided in the Retirement Equity Act of 1994. This Court shall retain jurisdiction to effectuate the entry of this order and if the CT Page 4108 plan administrator does not honor the Qualified Domestic Relations Order, the Court retains jurisdiction to enter an alternative order or orders to effectuate the intent of this subparagraph.
5. The plaintiff shall transfer $4,000.00 of her retirement plan as American Fund Group (403B) to a qualified plan or account of the defendant by way of a Qualified Domestic Relations Order, with the wife retaining all right, title and interest in and to the balance of said 403B plan. The husband shall retain all right, title and interest in and to his 401K plan in the amount of $36,429.75 as listed on his financial affidavit. The court shall retain jurisdiction to enter an alternative order or orders to effectuate the intent of this subparagraph.
6. The plaintiff shall further retain all right, title and interest in and to the personal injury lawsuit listed on her financial affidavit dated April 9, 1999 and any benefits received by way of any workers compensation claim arising out of said car collision.
7. The wife shall pay and hold the husband harmless on her debts to First USA, Peoples' Bank, R. Calabrese M.S.W., Q Card, Mechanics, Atty. Nancy Thompson and Chiropractor listed on her financial affidavit dated April 9, 1999 and the balance owed to Filenes, as testified to by the plaintiff. The husband shall pay $300.00 to the plaintiff representing the charges incurred by him on the Peoples' Account.
8. Each party shall retain the personal property in his or her possession including the automobiles, bank accounts and Spring St. Brewery Company stock listed on the financial affidavits and diamond engagement ring presently in the plaintiffs possession.
9. The defendant shall pay $1,500.00 counsel fees to plaintiffs counsel within 30 days of the date of this judgement as an allowance to prosecute. Koizim v. Koizim, 181 Conn. 492
(1980), Murphy v. Murphy, 180 Conn. 376 (1980).
10. The defendant shall further pay $1,500.00 toward the repairs to the present vehicle owned by the plaintiff or pay said sum toward the purchase of a new or used vehicle by the plaintiff at her sole decision. Payment to be made to the plaintiff by the defendant within 7 days of the plaintiff's decision by notice in CT Page 4109 writing to the defendant.
Devine, J.